## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| FINTHRIVE, INC.,<br><br>        *Plaintiff,*<br><br>v.<br><br>MATTHEW CONNOR,<br><br>        Defendant. | Civil Action No. |

## **COMPLAINT**

COMES NOW Plaintiff FinThrive, Inc., by and through their undersigned counsel, files the following complaint and states as follows:

## **PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiff FinThrive, Inc. ("FinThrive" or "Plaintiff") is a corporation incorporated under the laws of the State of Delaware, with a current principal place of business at 7950 Legacy Drive, Suite 900, Plano, Texas 75024, which was previously located at 200 North Point Center E, Alpharetta, GA 30022 in 2023.

2.      Defendant Matthew Connor ("Connor" or "Defendant") is a resident of the State of North Carolina, having an address of 401 Crooked Creek Road, Wilmington, NC 28409.

3.     The amount in controversy in this dispute exceeds the sum or value of $75,000, exclusive of interest and costs and is between citizens of different states.

4.     This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331, 1332, and 1367 and 18 U.S.C. § 1836(c) and 2201.

5.     This Court has personal jurisdiction over Connor as he consented to personal jurisdiction of this district by agreeing to exclusive venue here.

6.     Additionally, this Court also possesses specific and general personal jurisdiction over Connor (including under the Georgia long-arm statute, O.C.G.A. § 9-10-91) because Connor committed a tortious injury in Georgia caused by acts outside of Georgia, and regularly, systematically, and continuously did business within Georgia, as acknowledged by Connor in the Noncompetition Agreement. See Ex. 2, Noncompetition Agreement, ¶ 8.

7.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1400.

## FACTUAL ALLEGATIONS

8.     FinThrive is a healthcare revenue cycle management software-as-a-service provider.

9.     FinThrive provides an End-to-End Revenue Management Platform for healthcare providers that helps drive profitability, compliance, and accuracy.

10.    FinThrive's End-to-End Revenue Management Platform holistically analyzes end-to-end revenue management performance and enables leaders and

their teams with industry-leading intelligent solutions integrated into the right workflows, at the right time, to improve performance across the revenue cycle and maximize financial outcomes.

11.     FinThrive's Platform predicts and proactively prevents revenue loss for customers.

12.     FinThrive's End-to-End Revenue Management Platform facilitates revenue management at all stages of the healthcare process.

13.     FinThrive takes steps to protect its information, including using encrypted laptops, multifactor authentication, Centralized Active Directory, User Account Reviews, and USB encryption.

14.     Connor was hired by FinThrive on May 2, 2023.

15.     On or about May 2, 2023, Connor and FinThrive entered into FinThrive's Colleague Confidentiality Agreement ("Confidentiality Agreement"). A true and correct copy of the FinThrive's Colleague Confidentiality Agreement is attached hereto as Exhibit 1.

16.     FinThrive required Connor to agree to the Confidentiality Agreement as a condition of his employment. *See* Ex. 1, Confidentiality Agreement ¶ 2.

17.     The Confidentiality Agreement defined "Confidential Information" as follows:

> any and all information (whether or not reduced to writing) that is proprietary to the Company, or that is designated as confidential by

the Company, or that is not generally known to individuals other than those who work at or for the Company. "Confidential Information" also includes any trade secret, Invention (defined in Section 11 below), material, or other information that was conceived, originated, discovered, or developed in whole or in part by the Undersigned, as well as trade secret, Invention, material, or other information about which the Undersigned obtained knowledge or to which the Undersigned obtained access as a result of or in connection with the Undersigned's employment relationship with the Company. Confidential information also includes any trade secrets, Invention, material, or other information which the Company obtains from third parties, including consultants and customers, which the Company treats as proprietary of confidential, whether or not actually owned or developed by the Company.

Ex. 1, Confidentiality Agreement ¶ 3.

18.    The Confidentiality Agreement also states,

Examples of Confidential Information include but are not limited to Inventions, software in various stages of development, source code, object code, marketing strategies and non-public marketing materials, product development plans, product enhancement plans or recommendations, lists or summaries of expiring contracts compiled or stored by the company, lists or summaries of customer information compiled or stored by the company, price lists, pricing policies, financial information, colleague personnel files, Protected Health Information or "PHI" as the term is defined in the Health Information Portability and Accountability Act of 1996, research, development, procedures, specifications, models, diagrams, flow charts, and other data.

Ex. 1, Confidentiality Agreement ¶ 4.

19.    The Confidentiality Agreement identifies prohibited uses of

confidential information:

The Undersigned shall not directly or indirectly disclose, reveal, report, publish, or transfer any Confidential Information to any person or entity except as required in the regular course of the Undersigned's

> work for the Company. In addition, the Undersigned shall not obtain, access, and or use any Confidential Information for any purpose, except as required for the performance of his or her Company job duties.  These restrictions apply both during employment with the Company and after the employment relationship with the Company ends, regardless of how or why the employment relationship ends.

Ex. 1, Confidentiality Agreement ¶ 6.

20.    Pursuant to the Confidentiality Agreement, all Confidential Information belongs to FinThrive, and Connor was prohibited from taking any action with respect to the Confidential Information that was inconsistent with FinThrive's ownership rights. *See* Ex. 1, Confidentiality Agreement ¶ 9.

21.    The Confidentiality Agreement required the return of Confidential Information as follows:

> The Undersigned shall turn over to the Company all Confidential Information (including all work product or materials containing, incorporating, or reflecting Confidential Information) in the Undersigned's possession or control upon the Undersigned's separation from employment with the Company, or sooner if the Company so requests.

22.    Ex. 1, Confidentiality Agreement ¶ 10.

23.    Connor acknowledged that the improper use of FinThrive's Confidential Information would lead to irreparable harm as follows:

> Because of the unique nature of the Confidential Information and the Inventions, the Undersigned understands and acknowledges that the Company will suffer irreparable harm in the event that the Undersigned fails to comply with any of his or her obligations under Sections 6, 9, 10, 12, or 13 of this Agreement and that monetary damages will be inadequate to compensate the Company for such breach. Accordingly, the Company shall, in addition to the other

remedies available to it at law or in equity, be entitled to injunctive
relief to enforce the terms of Sections 6, 9, 10, 12, or 13 above
without the need to post a bond or other form of security.

Ex. 1, Confidentiality Agreement ¶ 20.

24.     On or about May 2, 2023, Connor entered into a Colleague
Noncompetition Agreement ("Noncompetition Agreement") with FinThrive.  A
true and correct copy of Connor's Noncompetition Agreement is attached hereto as
Exhibit 2.

25.     Connor agreed in the Noncompetition Agreement to "not engage in
any Competitive Activity (defined below) during the Non-Compete Period
(defined below) within the Applicable Geographical Area (defined below)." Ex. 2,
Noncompetition Agreement ¶ 2(b)(i).

26.     "Competitive Activity" in the Noncompetition Agreement "includes
any activity that would require or is reasonably likely to result in the disclosure of
Confidential Information." *See* Ex. 2, Noncompetition Agreement ¶ 2(ii).

27.     The Noncompetition Agreement's Non-Compete Period is defined to
include the duration of Connor's employment with FinThrive and the first twelve
(12) months immediately following his separation from FinThrive for any reason.
*See* Ex. 2, Noncompetition Agreement ¶ 2 (iii).

28.     The Noncompetition Agreement further contained a prohibition on
soliciting colleagues as follows:

I understand and acknowledge that the Company has expended and continues to expend significant time, effort, and expense in recruiting, training, developing, and retaining its colleagues, and that the loss of colleagues causes significant harm to the Company.  I hereby promise not to, directly or indirectly, during the Non-Solicit Period, take any steps to encourage any Company colleague to leave employment with the Company, or to engage in any activity that, if performed by Me, would violate this Agreement.  . . . . "Non-Solicit Period" means during my employment with the Company plus the first twelve (12) months immediately following my separation from Company employment for any reason.

Ex. 2, Noncompetition Agreement ¶ 2(d).

29.     The Noncompetition Agreement authorizes FinThrive to seek

immediate injunctive relief, including a temporary restraining order, a temporary injunction, a permanent injunction, or other equitable relief against such breach or threatened breach, without the necessity of showing any actual damages, without the necessity of showing that money damages would not afford an adequate remedy, and without the necessity of posting any bond or security.  The aforementioned equitable relief shall be in addition to, not in lieu of, and without prejudice to any legal remedies, monetary damages or other available forms of relief the Company may seek.

Ex. 2, Noncompetition Agreement, ¶ 5.

30.     Connor was employed by FinThrive from May 2023 through March

2024 as a Sales Lead on a channel partnership team.

31.     In Connor's role as a Sales Lead, he was primarily responsible for

selling FinThrive Payer Solutions directly to new logo Payers markets.

32.     Connor's job duties required the use of certain FinThrive Confidential

Information.

33.     On or about March 11, 2024, Connor tendered his resignation to FinThrive.

34.     On or about March 13, 2024, FinThrive held an exit interview with Connor.

35.     During the exit interview, FinThrive reminded Connor of his ongoing obligations under the Confidentiality Agreement and Noncompetition Agreement (collectively, the "Agreements").

36.     Based on Connor's comments during the exit interview, Connor insinuated that he had created documents during his time with FinThrive.

37.     FinThrive reminded him that these documents created during his time with FinThrive are owned by FinThrive and must not be retained.

38.     On or about March 14, 2024, FinThrive analyzed Connor's activity log and determined that Conor may have copied and/or zipped a large number of files from his company laptop and/or FinThrive's network.

39.     On or about March 20, 2024, FinThrive required Connor to return his laptop so that FinThrive could perform a forensic analysis of the device.

40.     FinThrive's forensic analysis of Connor's laptop revealed that Connor had accessed and downloaded an uncharacteristically large number of documents from his laptop and/or FinThrive's network (herein "FinThrive documents") which were placed on an external Mac device.

41.    Connor renamed several of the FinThrive documents that he took as "March 12" before exporting them to the external device.

42.    Many of the FinThrive documents that Connor accessed had nothing to do with Connor's role at FinThrive, such as product roadmaps and consumer proposals outside the payer space.

43.    Between February 27 and March 15, 2024, Connor downloaded more than 1,000 FinThrive files, many of which contained Confidential Information.

44.    Between February 27 and March 15, 2024, Connor accessed, moved, or downloaded 3,391 files.

45.    FinThrive's forensic analysis of the laptop showed that Connor accessed and moved 997 files to a zip folder in a single day, March 5, 2024.

46.    The files that Connor accessed contained Confidential Information, including but not limited to FinThrive's marketing strategies and non-public marketing materials, product development plans, product enhancement plans or recommendations, lists or summaries of expiring contracts compiled or stored by the company, lists or summaries of customer information compiled or stored by the company, price lists, pricing policies, financial information, research, development, procedures, specifications, models, diagrams, flow charts, and other data.

47.    Connor's last date of employment with FinThrive was on or about March 25, 2024.

48.    Upon information and belief, prior to his departure from FinThrive, Connor told his colleagues that he could take FinThrive's Confidential Information without any repercussions.

49.    Connor did not turn over the Confidential Information that he had downloaded prior to his departure from FinThrive.

50.    Upon information and belief, Connor has now begun working at Healthy.io as the Executive Director of Sales.

51.    On or about April 2, 2024, FinThrive contacted Healthy.io's CEO to inform them of Connor's violation of the Agreements and to direct them not to use FinThrive's Confidential Information.

52.    Upon information and belief, Connor intends to use or disseminate FinThrive's Confidential Information.

## COUNT 1: VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT

### 18 U.S.C. § 1836, et seq.

53.    FinThrive repeats and realleges the allegations asserted in Paragraphs 1 through 52 above as if set forth fully herein.

54.     FinThrive is the owner of all right, title, and interest in and to its confidential and proprietary information, including its customer lists, HMS Competitive Intelligence, data, pricing documents and proposals, ELT presentations, notes on strategy calls, and marketing plans, all of which constitute protectable "trade secrets" under 18 U.S.C. § 1839(3) and applicable common law (collectively, the "Trade Secrets").

55.     FinThrive has taken reasonable measures to keep its Trade Secrets secret, including, without limitation, requiring its employees, including Connor, to enter into a Colleague Confidentiality Agreement and a FinThrive Colleague Noncompetition Agreement containing provisions requiring that Trade Secrets be kept confidential, using encrypted laptops, multifactor authentication, Centralized Active Directory, User Account Reviews, and USB encryption.

56.     FinThrive's Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, others.

57.     Connor misappropriated FinThrive's Trade Secrets by knowingly acquiring the Trade Secrets by improper means.

58.     Upon information and belief, Connor further misappropriated FinThrive's Trade Secrets by disclosing and using those Trade Secrets outside of

his employment with FinThrive, despite direct knowledge, and in violation, of Connor's duty to FinThrive to maintain the secrecy of those Trade Secrets.

59.    Connor has been and will be unjustly enriched by the misappropriation of FinThrive's Trade Secrets.

60.    The Trade Secrets in the possession of Connor were obtained by breach of Connor's contractual duties to FinThrive and the conversion of FinThrive's property.

61.    Connor's misappropriation of FinThrive's Trade Secrets is willful and malicious in nature.

62.    Connor's misappropriation of FinThrive's Trade Secrets is the proximate cause of substantial damage to FinThrive.

63.    If not enjoined as requested herein, Connor's misappropriation of FinThrive's Trade Secrets will irreparably harm FinThrive.

64.    As a result of Connor's violation of 18 U.S.C. § 1836, FinThrive is entitled to permanently enjoin Defendant, Matthew Connor, and all persons in active concert or participation with him, from further misappropriation of trade secrets, pursuant to 18 U.S.C. § 1836.

65.    As a result of Connor's violation of 18 U.S.C. § 1836, FinThrive is entitled to all damages adequate to compensate Plaintiff, FinThrive, for Defendant Matthew Connor's misappropriation of trade secrets, including, without limitation,

damages for actual loss caused by the misappropriation of trade secrets, damages for any unjust enrichment caused by the misappropriation of trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B).

66.    As a result of Connor's violation of 18 U.S.C. § 1836, FinThrive is entitled to exemplary damages from Connor in an amount up to two times the award of its actual loss pursuant to 18 U.S.C. § 1836(b)(3)(C).

67.    As a result of Connor's violation of 18 U.S.C. § 1836, FinThrive is entitled to its reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

## COUNT II: MISAPPROPRIATION OF TRADE SECRETS
## O.C.G.A. § 10-1-760 *et seq.*

68.    FinThrive repeats and realleges the allegations asserted in Paragraphs 1 through 67 above as if set forth fully herein.

69.    FinThrive is the owner of all right, title, and interest in and to its confidential and proprietary information, including but not limited to its customer lists, HMS Competitive Intelligence, data, pricing documents and proposals, ELT presentations, notes on strategy calls, and marketing plans, all of which constitute protectable "trade secrets" under O.C.G.A. § 10-1-760, *et seq.*, and applicable common law (collectively, the "Trade Secrets").

70.    FinThrive's products, technology, and services are used in interstate commerce and are intended to be used in interstate commerce.

13

71.     FinThrive has taken reasonable measures to keep its Trade Secrets secret, including, without limitation, requiring its employees, including Connor, to enter into a Colleague Confidentiality Agreement and a FinThrive Colleague Noncompetition Agreement containing provisions requiring that Trade Secrets be kept confidential.

72.     FinThrive's Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, others.

73.     Connor misappropriated FinThrive's Trade Secrets by knowingly acquiring the Trade Secrets by improper means.

74.     Upon information and belief, Connor further misappropriated FinThrive's Trade Secrets by disclosing and using those Trade Secrets outside of his employment with FinThrive, despite direct knowledge, and in violation, of Connor's duty to FinThrive to maintain the secrecy of those Trade Secrets.

75.     Connor has been and will be unjustly enriched by the misappropriation of FinThrive's Trade Secrets.

76.     The Trade Secrets in the possession of Connor were obtained by breach of Connor's contractual duties to FinThrive and the conversion of FinThrive's property.

77.     Connor's misappropriation of FinThrive's Trade Secrets is willful and malicious in nature.

78.     Connor's misappropriation of FinThrive's Trade Secrets is the proximate cause of substantial damage to FinThrive or will cause irreparable harm to FinThrive if not enjoined.

79.     If not enjoined as requested herein, Connor's misappropriation of FinThrive's Trade Secrets will irreparably harm FinThrive.

80.     As a result of Connor's violation of O.C.G.A. § 10-1-760, *et seq.*, and applicable common law, FinThrive is entitled to permanently enjoin Defendant, Matthew Connor, and all persons in active concert or participation with him, from further misappropriation of trade secrets.

81.     As a result of Connor's violation of O.C.G.A. § 10-1-760, *et seq.*, and applicable common law, FinThrive is entitled to damages for actual loss caused by the misappropriation of trade secrets, damages for any unjust enrichment caused by the misappropriation of trade secrets.

82.     As a result of Connor's violation of O.C.G.A. § 10-1-760, *et seq.*, and applicable common law, FinThrive is entitled to exemplary damages in an amount up to two times the award of its actual loss pursuant to O.C.G.A § 10-1-763.

83.     As a result of Connor's violation of O.C.G.A. § 10-1-760, *et seq.*, and applicable common law, FinThrive is entitled to reasonable attorneys' fees pursuant to O.C.G.A § 10-1-764.

## COUNT III: BREACH OF CONTRACT

84.     FinThrive incorporates by reference the allegations contained in paragraphs 1 through 83 as if fully set forth herein.

85.     The Agreements are binding contracts between FinThrive and Connor.

86.     Connor breached the Agreement in the following ways:

   a.  By obtaining, accessing, and/or using FinThrive's confidential information for a purpose other than as required for the performance of his Company job duties in violation of the Confidentiality Agreement, paragraph 6;

   b.  By failing to turn over to FinThrive all Confidential Information in Connor's possession or control upon Connor's separation from employment with FinThrive in violation of the Confidentiality Agreement, paragraph 10;

   c.  By engaging in a Competitive Activity during the Non-Compete Period within the Applicable Geographical Area in violation of the Noncompetition Agreement, paragraph 2(b)(i);

    d.  By directly or indirectly taking steps to encourage FinThrive's

        employees to engage in a Competitive Activity in violation of

        the Noncompetition Agreement in violation of the

        Noncompetition Agreement paragraph 2(d).

87.     Plaintiff has satisfied all preconditions necessary to enforce its rights under the Agreements.

88.     Upon information and belief, there is a substantial threat that Connor will continue to violate the Agreements unless prohibited from doing so by this Court.

89.     FinThrive has suffered damages as a direct and proximate result of Connor's breach of the Agreements in an amount to be demonstrated at trial.

90.     Connor's actions as complained of herein were committed in bad faith, has been stubbornly litigious, has caused the plaintiff unnecessary trouble and expense, and in such a manner so as to authorize the recovery of attorneys' fees and expenses from Connor pursuant to O.C.G.A. § 13-6-11.

91.     Connor's breach of contract has and will continue to cause FinThrive irreparable harm.

92.     Connor's breaches have threatened irreparable harm to FinThrive due to the risk that its Confidential Information will be further disseminated and used without FinThrive's consent or approval.

93.    As a result of Connor's contract breaches, FinThrive is entitled to damages in an amount to be proven at trial, for injunctive relief to prevent further harm to FinThrive, and for attorney's fees pursuant to O.C.G.A. § 13-6-11.

## COUNT IV: DECLARATORY JUDGMENT

94.    FinThrive incorporates by reference the allegations contained in paragraphs 1 through 93 as if fully set forth herein.

95.    The Declaratory Judgment Act provides a means by which parties can settle and obtain relief with respect to the rights and status of legal relations and provides authority to declare the rights and status of legal relations where there is an actual controversy regarding such rights and status. *See* Ga. Code Ann. § 9-4-2.

96.    FinThrive believes that the provisions of the Agreements are valid, enforceable, and applied to Connor's download of FinThrive's Confidential Information and Connor's failure to turn over FinThrive's Confidential Information at the end of his employment with FinThrive.

97.    Connor told other FinThrive employees that he could keep FinThrive's Confidential Information that he had created or provided input into without any consequences.

98.    FinThrive seeks to take immediate measures to protect its Confidential Information.

99.     Given the dispute and uncertainty as to FinThrive's rights, FinThrive seeks a declaratory judgment order holding that Confidentiality Agreement, paragraph 10, the Noncompetition Agreement, paragraph 2(b)(i), and the Noncompetition Agreement paragraph 2(d), are valid, enforceable, and apply to prohibit an employee from downloading Confidential Information and retaining it after his employment at FinThrive has ended.

WHEREFORE, Plaintiff, FinThrive, Inc., respectfully requests that this Court enter judgment in its favor and against Defendant, Matthew Connor, as follows:

A.     Declaring that Defendant has misappropriated FinThrive's trade secrets in violation to 18 U.S.C. § 1836;

B.     Permanently enjoining Defendant, Matthew Connor, and all persons in active concert or participation with him, from further misappropriation of trade secrets, pursuant to 18 U.S.C. § 1836;

C.     Ordering Defendant Matthew Connor to pay to Plaintiff, FinThrive, all damages adequate to compensate Plaintiff, FinThrive, for Defendant Matthew Connor's misappropriation of trade secrets, including, without limitation, damages for actual loss caused by the misappropriation of trade secrets, damages for any unjust enrichment caused by the misappropriation of trade secrets pursuant to 18

U.S.C. § 1836(b)(3)(B);

     D.     Order Defendant Matthew Connor to pay to Plaintiff, FinThrive, exemplary damages in an amount up to two times the award of its actual loss pursuant to 18 U.S.C. § 1836(b)(3)(C);

     E.     Awarding FinThrive its reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D);

     F.     Entering judgment in its favor and against Defendant, Matthew Connor, on the misappropriation of FinThrive's trade secrets in accordance with O.C.G.A. § 10-1-760, et seq. and applicable common law;

     G.     Permanently enjoining Defendant, Matthew Connor, and all persons in active concert or participation with him, from further misappropriation of trade secrets, pursuant to O.C.G.A § 10-1-760, et seq., and applicable common law;

     H.     Ordering Defendant Matthew Connor to pay to Plaintiff, FinThrive, all damages adequate to compensate Plaintiff, FinThrive, for Defendant Matthew Connor's misappropriation of trade secrets, including, without limitation, damages for actual loss caused by the misappropriation of trade secrets, damages for any unjust enrichment caused by the misappropriation of trade secrets pursuant to O.C.G.A § 10-1-760, et seq., and applicable common law;

     I.     Ordering Defendant Matthew Connor to pay to Plaintiff, FinThrive, exemplary damages in an amount up to two times the award of its actual loss

pursuant to O.C.G.A § 10-1-763;

     J.     Awarding FinThrive's reasonable attorneys' fees pursuant to O.C.G.A § 10-1-764;

     K.     Declaring Defendant breached its contract with Plaintiff, and award Plaintiff damages in an amount to be proven at trial, for injunctive relief to prevent further harm to FinThrive, for attorney's fees pursuant to O.C.G.A. § 13-6-11;

     L.     Declaring that Confidentiality Agreement, paragraph 10, the Noncompetition Agreement, paragraph 2(b)(i), and the Noncompetition Agreement paragraph 2(d), are valid, enforceable, and apply to prohibit an employee from downloading Confidential Information and retaining it after his employment at FinThrive has ended;

     M.     Taxing all costs against Defendant; and

     N.     Awarding such other and further relief as the Court deems just and proper.

Submitted this 9th day of April, 2024.

Respectfully submitted,

*/s/ Matthew P. Warenzak*
Matthew P. Warenzak
Georgia Bar No. 624484
SMITH, GAMBRELL, AND RUSSELL, LLP
1105 West Peachtree Street, NE, Suite 1000
Atlanta, Georgia 30309
Telephone: (404) 815-3500
mwarenzak@sgrlaw.com

Christopher A. Proskey, *pro hac vice forthcoming*
Iowa Bar No. AT0009316
Stephanie A. Koltookian, *pro hac vice forthcoming*
Iowa Bar No. AT0012724
BROWN, WINICK, GRAVES, GROSS AND
BASKERVILLE, P.L.C.
666 Grand Avenue, Suite 2000
Des Moines, IA 50309-2510
Telephone: 515-242-2400
chris.proskey@brownwinick.com
stephanie.koltookian@brownwinick.com

*ATTORNEYS FOR PLAINTIFF*
*FINTHRIVE, INC.*